Albert L. De GRAFFENRIED, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 541–80C.

United States Claims Court.

May 18, 1990.

See also 14 Cl.Ct. 517.

Richard C. Conover, Bozeman, Mont., for plaintiff.

Chun–I Chiang, with whom were Asst. Atty. Gen. Stuart M. Gerson and Vito J. DiPietro, Director, Washington, D.C., for defendant.

## OPINION

ANDEWELT, Judge.

In this patent action filed pursuant to 28 U.S.C. § 1498, plaintiff, Albert L. de Graffenried, seeks compensation from the United States for the unauthorized use of a device allegedly covered by Claims 1, 2, 5, and 6 of United States Patent No. 3,217,568 (the controller patent). The device in issue is a control system used by the United States Army for the control of "runout" during the manufacture of large cannons (gun barrels) at the Watervliet Arsenal in Watervliet, New York (the Arsenal). Defendant contends that it is not liable under 28 U.S.C. § 1498(a) because (1) the patent claims in issue are invalid, (2) the patent claims do not cover the runout control system used by the Arsenal (i.e., the Arsenal device does not infringe the patent claims), and (3) plaintiff's cause of action is barred under the doctrine of laches.

Based on the record produced at trial, the court finds for plaintiff on each issue. Defendant has not established either that the claims are invalid or that this action is barred by the doctrine of laches, and plaintiff has established that the claims cover the accused Arsenal device.

## I. *Background—The Manufacture of Gun Barrels*

Cannons are longstanding weapons of war. The Arsenal commenced cannon manufacture for the United States Armed Forces in the 1800s.

The modern-day manufacture of a cannon commences with the production of a cylindrical tube "forging," which is the approximate length of the finished gun barrel and has a rough cored hole extending its entire axial length.[1] A precisely dimensioned hole is then bored into the forging, i.e., the rough cored hole is enlarged to a hole of desired diameter. Unlike conventional drilling, where a hole is formed by inserting a rotating drill bit into a stationary work piece, in cannon manufacture the work piece (i.e., the forging) is rotated with respect to the cutting tool. The forging is positioned on a lathe and rotated. A boring bar with a cutting or boring head is then advanced into the forging along the forging's axis of rotation. As the cutting head advances into the rotating forging, it cuts away material along the sides of the rough cored hole. This process is referred to as deep boring or reaming.

The quality of the resulting gun barrel depends upon numerous factors, including the position of the final bored hole. To achieve an optimal result, it is important that the center of the bored hole be close to the center of the forging, i.e., that the center of the hole be near the center of the forging throughout its entire axial length. Achieving this result with consistency, however, has proven difficult. A problem long encountered is that of "runout," where the advancing cutting head moves off the axis of rotation of the forging. Runout can be caused by several factors such as runout of the previously forged hole, variation in the hardness of the forging material, dullness of one or more of the

---

1. Depending upon the ultimate dimension of the finished barrel, the length of the forging can range from 10 to 50 feet. In addition, the outer diameter of the forging can vary from 9.2 to 13.5 inches and the diameter of the rough cored hole can vary from 3 to 5 inches.

cutters in the cutting head, or improper operation by the lathe operator.

Over the years, a number of technologies have been used to reduce runout in the deep boring of gun barrels. One technology, used as early as the 1800s, is known as the "conventional pack reamer." The conventional pack reamer used a cylindrical boring head with two cutters which were attached to a boring bar. Mounted on the boring bar behind the cutters was a relatively long wood or, more recently, neoprene pack section. The pack constituted a substantial part of the boring head's circumferential surface and thus provided a tight fit between the boring head and the just-bored hole. By providing a tight running fit and by adding stiffness to the boring bar, the pack reduced any wobbling of the cutting head and, as a result, reduced runout. But while the conventional pack reamer lessened the problem of runout, it did not totally eliminate it. For example, as the cutting head moved down the forging, the packing material became worn and the fit became less tight.

A second technology, used in the late 1950s and early 1960s, is known as the "rapid bore reamer." Like the conventional pack reamer, the rapid bore reamer utilized a cutting head mounted on a boring bar, but instead of using solid packing to provide tightness and stiffness, this device used a fluid. The forging was sealed at one end and a fluid (*e.g.*, oil) was forced under pressure between the cutting head and the just-bored hole. This pressurized fluid served both to cool and stabilize the cutting head during the reaming process. The rapid bore reamer substantially reduced the time necessary to make a gun barrel but it did not solve the problem of runout.

Both the conventional pack reamer and the rapid bore reamer were "blind" operations in that their cutting heads were inside the forging. This prevented the lathe operator from seeing directly whether runout

had occurred. When employing these technologies, lathe operators were sometimes able to detect runout by (1) watching to see if the boring bar wobbled, (2) viewing the boring head from one end of the forging to detect movement off center, or (3) examining the shape of the metal chips removed from the forging ("reading the chips").[2] If runout was detected, the boring head had to be removed and the location and magnitude of runout could be determined by using a mechanical "telltale device." None of these detection methods, however, permitted an accurate quantitative measurement of the amount of runout during deep boring operations and none permitted correction of runout without removing the boring head.

## II. *Efforts at the Watervliet Arsenal to Prevent Runout*

In early 1957, at the request of Arsenal employees, William A. Folsom, an associate of Flight Command Associates (FCA), a small company of which plaintiff was a principal, visited the Arsenal and was briefed on the problem of runout in the manufacture of gun barrels. On March 8, 1957, Folsom and plaintiff met with representatives of the Arsenal to discuss whether runout could be measured during deep boring operations. At that meeting, Folsom and plaintiff received a chart listing the acceptable runout limits at different points along the axial length of the forging.

Folsom subsequently concluded that runout could be detected by mounting a device known as an accelerometer adjacent to the cutting head. An accelerometer detects acceleration. When there is no runout (*i.e.*, the center of the boring head coincides with the axis of rotation of the forging), the boring head would remain steady and the attached accelerometer would remain still. However, as the following cross-sectional diagram shows, when runout occurs (*i.e.*, the center of the boring head departs from

---

**2.** When the boring head operates along the axis of the forging, the chips of metal removed are approximately uniform in shape. However, when runout occurs, and the boring head no longer operates along the axis of the forging, the chips of metal removed vary in shape. Upon noticing such variances, a skilled operator would know runout had occurred.

the axis of rotation of the forging), the boring head and the attached accelerometer would orbit about the axis of rotation of the forging, i.e., the rotation of the forging would result in the rotation of the boring head.[3]

NO RUNOUT RUNOUT

BORING HEAD AT AXIS
OF ROTATION OF FORGING

DISPLACED BORING
HEAD ROTATING ABOUT
AXIS OF ROTATION
OF FORGING

RUNOUT OF BORING
HEAD FROM AXIS OF
ROTATION OF FORGING

As a result of this movement of the boring head, the accelerometer would emit a signal. The greater the amount of runout, the greater the amplitude of acceleration and the greater the amplitude of the signal.

On or about September 9, 1957, plaintiff prepared and forwarded to Arsenal employees an unsolicited "proposal for a study and development project" which proposed the development of a runout indicator.[4] In 1958, the Arsenal awarded FCA a contract covering the "[d]esign, manufacture, and test[ing] of a device to indicate tool runout during deep boring operations on 90mm gun barrels and to give an alarm when the runout exceeds the maximum value...."

From 1958 to 1960, plaintiff and Folsom worked on developing a runout indicator device for use in deep boring operations at the Arsenal. In addition, plaintiff began thinking on his own about how runout could actually be controlled during deep boring operations. Plaintiff concluded that the condition of runout could be abstractly represented by a vector, i.e., by an arrow extending from the center of rotation of the forging to the center of the bored hole. (A vector is an abstract concept commonly thought of as an arrow indicating direction and having a length corresponding to a scaler quantity.) During runout, the vector would rotate with the boring head as it orbited the axis of rotation of the forging. Plaintiff concluded that the signal given off by the accelerometer in Folsom's design would be representative of the horizontal projection of the vector onto the horizontal axis of the forging. As a result, plaintiff concluded, the output of the accelerometer would provide information not only as to the magnitude of runout, as Folsom had discovered, but also as to the direction of runout, i.e., the location of the bored hole with respect to the center of rotation of the forging. The signal output of the accelerometer would be sinusoidal (a sine wave ⌢⌣) with a maximum value when the boring head is on the horizontal axis of the forging and a zero value when the boring head

---

**3.** For ease of illustration, the rough cored hole is not shown, the comparative size of the boring tool is reduced, and the amount of runout is exaggerated. The maximum runout allowable by the Arsenal was on the scale of a fraction of an inch.

**4.** Runout correction was also mentioned in the proposal under the heading "A Subsequent Problem." Plaintiff stated:

A few brief comments on runout correction are offered here. Based on an estimate by F.C.A. engineers of 80% probability of success in building such a run-out detector/indicator, one can justify a "first look" at the problem of run-out correction.

is on the vertical axis. The phase of the sinusoidal signal, *i.e.*, where the peaks and valleys occur, would indicate the direction of runout. Plaintiff concluded that since the accelerometer signal contains information both as to the magnitude and the location of runout, the signal could be used to control runout.

In 1960, FCA delivered to the Arsenal an indicator device, an operating manual, and a final report entitled "An Electronic Tool–Run–out Indicator for Use in Deep Boring Operations (90mm gun barrels)." The final report suggested that it might be possible to use the accelerometer signal not only to detect but also to control runout. On July 20, 1960, plaintiff and Folsom filed a patent application, as co-inventors, covering a method for detecting runout using an accelerometer. This application ultimately was issued as United States Patent No. 3,020,-786 (the indicator patent).

As a result of the success of the runout indicator developed by FCA, in early 1962, Arsenal personnel began to explore development of a runout controller. The procurement procedure was conducted in a two-step competitive process. First, interested parties were asked to submit technical proposals; second, for those technical proposals deemed qualified, the submitted parties were asked for competitive bids. The "Request for Technical Proposals," sent out on June 6, 1962, did not specify use of the runout indicating technology developed by FCA because FCA's work was considered developmental and not necessarily the best approach to controlling runout. The project leader of the effort to develop a controller was Arsenal employee William Wondisford.

In response to the Arsenal's "Request for Technical Proposals," FCA proposed a runout controller system in which an accelerometer would produce a runout error signal which would activate a "force generating means" (either electromagnetic or hydraulic) to move the boring head back to its desired center position of the forging. Prior to submission of FCA's technical proposal, on May 23, 1962, plaintiff filed a patent application for a "Device for Controlling

Deep Boring Operations in a Rotating Object" which ultimately was issued as the controller patent, in issue in this action.

Bergen Research Engineering Corp. (Bergen) submitted a competing technical proposal which employed a radically different technological approach for controlling runout. Bergen proposed extending a taut wire along the axis of the forging through the already existing rough cored hole. During runout, when the cutting head would move off the taut wire, hydraulic pistons would guide the cutting head back to its desired center position.

The Arsenal found both FCA's and Bergen's proposals technically acceptable and awarded the contract to Bergen which had submitted a substantially lower bid—$28,-086 versus FCA's bid of $46,000. Bergen engineers worked with Arsenal personnel on the development of the taut wire technology but, ultimately, they decided the technology would not work. Instead, they decided to use accelerometers to detect runout and direct the movement of hydraulic pistons, as was originally proposed by FCA. On July 2, 1965, the Arsenal accepted a controller unit developed by Bergen and paid the amount remaining due under the contract.

The Bergen controller device never was used in the production of gun barrels but the Arsenal continued development and manufacture of a runout controller. The project was ultimately successful. In January 1967, a bore guidance device was first used at the Arsenal in deep boring operations, and in December 1968, a runout controller was used in the production of gun barrels. By March 1980, 19,585 gun barrels had been manufactured at the Arsenal using lathes adapted with runout controllers.

III. *The Indicator and Controller Patents*

A. The Indicator Patent

The indicator patent was issued to plaintiff and Folsom as co-inventors on February 13, 1962. The patent, entitled "Electronic Tool Run–Out Indicator for Use in

Deep Boring Operations," discloses a device for sensing and indicating the presence of runout during the manufacture of gun barrels. The device contains a boring tool which has a boring head with cutters attached. Hingedly mounted along the center line of the boring head is an accelerometer. When runout occurs, the boring head and attached accelerometer rotate about the center of rotation of the forging. The rotation causes the accelerometer to emit a signal. When the displacement of the boring tool from the center line of rotation exceeds a predetermined value, an alarm is sounded.

The indicator patent discloses three types of accelerometers: a seismic pendulum, a capacitive displacement accelerometer, and an "electrolytic accelerometer." The indicator patent does not specifically indicate that the signal emitted by the accelerometer can be used to control runout. It does, however, in columns 3 and 4 and figure 2, describe plaintiff's vector theory of runout.

B. The Controller Patent—Description of the Invention in the Specification

The controller patent, issued on November 16, 1965, discloses a device for controlling runout during deep boring operations. Plaintiff is the sole inventor and sole owner of the patent. The patent specification commences with a discussion of the indicator patent. The specification states, in effect, that the indicator patent discloses a device for sensing and measuring runout during deep boring operations through a runout signal, and that the contribution of plaintiff in the controller patent is to use that runout signal to control runout by restoring the boring head to the axis of rotation of the forging.

The controller patent, like the indicator patent, describes a device containing a boring tool which has a boring head with cutters and an accelerometer hingedly attached. The only accelerometer specifically described in the controller patent is a seismic pendulum. When runout occurs, the boring head begins to orbit about the axis of rotation of the forging and the seismic pendulum begins to swing. The angle at which the pendulum swings is converted into a proportional voltage by a rotary variable differential transformer. The proportional voltage modulates a carrier wave which is subsequently manipulated by electrical circuitry. The resulting sinusoidal signal can be extrapolated to represent the magnitude and direction of runout—the amplitude of the sinusoidal signal is directly proportional to the magnitude of runout and the phase of the sinusoidal signal indicates the direction of the runout, *i.e.*, the location of the boring head with respect to the center of rotation of the forging. The sinusoidal signal is then used to create a restoring force which returns the boring head to the longitudinal axis of rotation of the forging. The specification indicates that the restoring force can be hydraulic, Pneumatic, or electromagnetic.

The controller patent discloses two possible modes of operation—open loop and closed loop. The open loop mode involves the participation of the lathe operator in the correction of runout, while the closed loop mode is fully automatic. In the open loop mode, the lathe operator "reads" the sinusoidal signal to note the position and magnitude of the runout and then performs an adjustment to produce the desired restoring force. In the closed loop mode, an error signal is used to trigger automatically the appropriate restoring force.

IV. *The Controller Patent—The Claims in Issue*

Claims 1, 2, 5, and 6 of the controller patent each covers a boring device. Claims 1 and 6 are independent and Claims 2 and 5 are dependent upon Claim 1. The claims are reproduced below.

1. A boring device for deep boring an object rotating about an axis, comprising:

■ a boring tool adapted to be advanced substantially parallel with said axis and including a cutting head for cutting the interior of said rotating object;

■ means for advancing said boring tool;

■ means adapted to sense the direction and magnitude of the run-out

from said axis to the center of a bored hole made by said cutting head, said sensing means being adapted to generate a run-out signal indicative of said magnitude and direction, whereby the position of the boring tool relative to said axis may be determined;

■ force generating means adapted to provide a force acting on the cutting head to cause radial displacement of said cutting head responsive to said run-out signal whereby said run-out may be controlled in direction and magnitude.

2. The apparatus of claim 1 wherein said force generating means are hydraulic means.

5. A device as in claim 1 wherein said means to generate a run-out signal comprise movable means mounted on said boring tool for sensing movement of the boring tool, whereby upon said boring tool being subjected to run-out, the center of said boring tool orbits about the said center line and imparts oscillatory motion to said movable means, and electrical means responsive to the movement of said movable means for indicating the existence and degree of run-out, wherein said movable means includes a pendulum member hingedly mounted on the center line of said boring tool and vibrating in response to the orbital motion of said boring tool, and wherein said electrical means include a rotary variable differential transformer, wherein said transformer is sinusoidally modulated by said pendulum swings.

6. A device for controlling the deep boring of an object rotating about a predetermined axis and in engagement with a cutting head comprising:

a boring tool adapted to be advanced approximately in parallel with said center line and including said cutting head;

means for axially advancing said boring tool along the axis;

means mounted on said boring tool adapted to sensing the direction and magnitude of the run-out from said axis to the center of the bored hole made by said cutting head, said

sensing means being adapted to generate a run-out signal indicative of said magnitude and direction, whereby the position of the boring tool relative to the axis may be determined;

electromagnetic means disposed proximate to said boring tool, said electromagnetic means being adapted to generate a force and thereby radially displace said boring head and said rotating object relative to each other upon energization of said electromagnetic means; and

means responsive to said run-out signal to selectively impart such energization whereby said displacement of said cutting head and said rotating object relative to each other may be controlled in direction and magnitude.

Defendant contests the validity of all claims in issue. Defendant alleges that Claims 1, 2, and 5 are invalid for failing to meet the statutory requirement of nonobviousness (35 U.S.C. § 103) and that Claim 6 is invalid because the invention there described is inoperative (35 U.S.C. § 101).

## V. Claims 1, 2, and 5 are Not Invalid Based on Obviousness

### A. Legal Standards

In *Casler v. United States*, 15 Cl.Ct. 717, 722–23, 9 USPQ2d 1753, 1757 (1988), this court recently reviewed the legal standards applicable when assessing whether a claim satisfies the statutory requirement of nonobviousness. The court stated:

Pursuant to 35 U.S.C. §§ 103 and 282, the claims in a patent are invalid if "the differences between the subject matter [of the claims] and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to one of ordinary skill in the art to which the subject matter pertains." The claims in an issued patent are presumed valid, 35 U.S.C. § 282, and the party challenging validity has the burden of proving invalidity by clear and convincing evidence. *Atlas Powder Co. v. E.I. Du Pont de Nemours & Co.*, 750

F.2d 1569, 1573, 224 USPQ 409, 411 (Fed. Cir.1984).

A determination on the issue of nonobviousness entails a conclusion of law. *Environmental Designs, Ltd. v. Union Oil Co. of California,* 713 F.2d 693, 695, 218 USPQ 865, 867 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). However, that legal conclusion must be based upon a series of factual determinations. The court must evaluate (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the pertinent art, and (4) evidence directed at so-called secondary considerations, which may serve as indicia of nonobviousness. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966); *Atlas Powder,* 750 F.2d at 1574, 224 USPQ at 412; *Environmental Designs,* 713 F.2d at 695, 218 USPQ at 867.

**B. Scope and Content of the Prior Art**

The sole reference cited by the Patent Office prior to issuing the controller patent was the previously issued indicator patent. In contesting the validity of the controller patent, defendant relies upon the indicator patent plus four other written references: United States Patent No. 2,475,245 issued on July 5, 1949, to E.W. Leaver, et al. (the Leaver patent); United States Patent No. 3,069,608 issued on December 18, 1962, to J.W. Forrester, et al. (the Forrester patent); a text published in 1958 and authored by J. Bower and P. Schultheiss entitled "Introduction to the Design of Servomechanisms" (the Bower text); and a report issued in April 1957 by H.J. Haag entitled "Significant Achievements in the Reaming of Gun Barrels" (the Haag report). In addition, defendant relies upon the indicator device delivered by FCA to the Arsenal in March 1960. Plaintiff disputes defendant's use of each of the five written references and the indicator device as prior art.

*1. Only Parts of the Indicator Patent are Within the Scope of the Prior Art*

■ Defendant contends that the indicator patent is properly classified as prior art pursuant to 35 U.S.C. § 102(e) and that the indicator patent combined with the indicator device delivered by FCA to the Arsenal are prior art under 35 U.S.C. § 102(g). Plaintiff agrees that parts of the specification in the indicator patent are prior art but contends that other parts are not.

35 U.S.C. § 102 states, in pertinent part: A person shall be entitled to a patent unless—

\* \* \* \* \* \*

(e) the invention was described in a patent granted on an application for patent by *another* filed in the United States before the invention thereof by the applicant for patent ...

\* \* \* \* \* \*

(g) before the applicant's invention thereof the invention was made in this country by *another* who had not abandoned, suppressed, or concealed it.

(Emphasis added.) The dispute herein involves the extent to which the indicator patent is by "another" and, hence, prior art against the controller patent.

Defendant contends that the indicator patent is by "another" vis-a-vis the controller patent because the indicator patent was issued jointly to plaintiff and Folsom while the controller patent was issued to plaintiff alone. Defendant is correct that the combination of plaintiff and Folsom is a different inventive entity than plaintiff alone, and that joint work by plaintiff and Folsom can be prior art against plaintiff's controller patent. The pertinent law in this regard has been summarized as follows:

> In determining whether prior work is in fact by "another," the theory of the inventorship entity must be applied. The sole work of one person is usable against the joint work of that person with another. Similarly, the joint work of two or more persons is usable against the sole work of both and against the joint work of any other inventorship entity.

1 D. Chisum, *Patents,* § 3.08[2] at 3–152 (1990) (footnote omitted); *see also, In re Ward and Switzer,* 236 F.2d 428, 431–32, 43 CCPA 1007, 111 USPQ 101, 104 (1956).

■ But as explained in *In Re DeBaun*, 687 F.2d 459, 214 USPQ 933 (CCPA 1982), simply because a patent is issued to joint inventors does not mean that everything disclosed in that patent is necessarily joint work which would constitute prior art against a subsequent patent application by one of the two joint inventors. In *De-Baun*, a patent covering an air sampling system was issued to two inventors, Kenneth W. DeBaun and Robert W. Noll. De-Baun subsequently filed a patent application on his own which contained claims covering a specific cross section of an air duct disclosed but not claimed in the patent previously issued to DeBaun and Noll. De-Baun filed an affidavit to the effect that he was the inventor of the cross section and that the cross section had been included in the previous joint patent on the advice of counsel. The Court of Customs and Patent Appeals found this affidavit sufficient to prevent the prior disclosure in the joint patent from being used as prior art against DeBaun's individual discovery. The court rejected the argument that all information disclosed in a joint patent was necessarily the product of a joint invention. The court stated: "The [joint] patent is silent with respect to who invented the [cross] section itself, and we do not presume that it is the invention of DeBaun and Noll jointly or of either of them." *Id.* at 463, 214 USPQ at 936. The *DeBaun* court explained that in such a case "the proper subject of inquiry was ... what the *evidence* showed as [to] *who* invented the [cross section disclosed in the patent]." *Id.* at 462, 214 USPQ at 935 (emphasis added).

Thus, *DeBaun* requires a factual determination as to which parts of the indicator patent were the product of joint work and, hence, would constitute prior art, and as to which parts were the product of plaintiff's independent work and, hence, would not constitute prior art.

■ The evidence on this issue, including the trial testimony of plaintiff and Folsom, is entirely consistent. As explained above, Folsom originated the idea that attaching an accelerometer to a boring head would produce a sinusoidal signal indicative of the magnitude of runout. However, Folsom did not consider using that signal to control runout. Without Folsom's participation, plaintiff developed his vector approach to runout and concluded that the phase of the accelerometer's sinusoidal signal would be indicative of the direction of runout. Plaintiff drafted the application for the indicator patent on his own. He did not specifically mention the use of an accelerometer signal to control runout but he did describe his vector theory which arguably suggests the use of an accelerometer signal to control runout. This latter description is plaintiff's contribution, not Folsom's, and therefore cannot, under *DeBaun*, be used as prior art against the controller patent pursuant to 35 U.S.C. §§ 102(e) and (g).

· 2. *The Indicator Device is Within the Scope of the Prior Art*

The indicator device, in pertinent part, is apparently a physical embodiment of the device described in the indicator patent. It does not contain any structures that plaintiff alleges were the product of plaintiff's work alone. Hence, the indicator device is by "another" and therefore within the scope of the prior art.

3. *The Leaver and Forrester Patents are Within the Scope of the Prior Art*

■ Plaintiff contends that the Leaver and Forrester patents are not within the scope of the prior art herein because, unlike the controller patent, they do not involve deep boring operations. The controller patent describes a machine tool operation involving a lathe in which a runout error signal is changed into a negative error signal which is then used to move the boring head in the opposite direction of runout. As described below in more detail, both the Leaver and Forrester patents similarly involve machine tool operations employing negative feedback to assure that the final product is cut to desired specifications. The Leaver patent involves a lathe and the Forrester patent, while specifically disclosing a milling machine, indicates that it can be used in other operations. While neither the Leaver nor Forrester patent

specifically discloses deep boring operations and both differ in other ways from the invention described in the controller patent, both are "reasonably pertinent to the particular problem" with which plaintiff was faced when seeking a solution to runout. Therefore, under *In Re Wood and Eversole*, 599 F.2d 1032, 1036, 202 USPQ 171, 174 (CCPA 1979),[5] the Leaver and Forrester patents are "analogous art" and within the scope of the prior art for 35 U.S.C. § 103 consideration.[6]

### 4. *The Bower Text is Within the Scope of the Prior Art*

As summarized below, the Bower text defines the term "servomechanism" and teaches the use of servomechanisms for correction of errors. Plaintiff contends that the Bower text is not prior art because it does not discuss deep boring operations and lacks an "enabling disclosure."

The absence of a discussion of deep boring operations is not fatal here because the Bower text qualifies as "analogous" art. As evidenced in the pertinent disclosures of the Forrester and Leaver patents discussing the use of negative feedback mechanisms, it would be expected that one reasonably skilled in the pertinent art would be familiar with the principles of the servomechanisms discussed in the Bower text.

█ Next, plaintiff is correct that the Bower text lacks an enabling disclosure in that it does not disclose sufficient information to enable a person reasonably skilled in the art to devise a controller device without further inspiration or undue experimentation. But while an enabling disclo-

sure may be required when determining whether an invention is anticipated by the prior art under 35 U.S.C. § 102 (*see, e.g., Struthers Scientific & Int'l Corp. v. Rappl & Hoenig*, 453 F.2d 250, 172 USPQ 257 (2d Cir.1972)), there is no need for an enabling disclosure when assessing pertinent prior art for a Section 103 obviousness analysis. As explained in *Minnesota Mining & Mfg. Co. v. Blume*, 684 F.2d 1166, 1172 n. 10, 215 USPQ 585, 590 n. 10 (6th Cir.1982), *cert. denied*, 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803, 461 U.S. 939, 103 S.Ct. 2110, 77 L.Ed.2d 314 (1983):

> The standard [under 35 U.S.C. § 103] is quite simply whether the prior art, taken as a whole makes obvious the invention under consideration.... [T]o argue ... that the sufficiency of each prior art teaching must be tested under a strict standard requiring an enabling disclosure is to shift the emphasis from obviousness in light of the prior art, taken as a whole, to the sufficiency of each prior art teaching separately considered.

### 5. *The Haag Reference is Not Within the Scope of the Prior Art Because it Does Not Qualify as a Printed Publication Under 35 U.S.C. § 102*

The Haag report is an Arsenal document dated April 1957. Under the heading "Future Work," the report describes future possible efforts directed at solving the problem of runout in the manufacture of gun barrels. Apparently based on conversations with plaintiff, the report mentions that "[i]nvestigation and development are presently directed towards utilization of an

---

**5.** Plaintiff also argues that the Leaver and Forrester patents cannot be part of a combination reference because neither patent suggests that it could be used as the force generating means stated in Claim 1 of the controller patent. However, the suggestion of combination may be implicit from the teachings of all the references viewed together. *Milliken Research Corp. v. Dan River, Inc.*, 739 F.2d 587, 602, 222 USPQ 571, 583 (Fed.Cir.1984). Therefore, assessing whether the references suggest a combination is a question of obviousness, which is discussed below.

**6.** In *Wood and Eversole*, the Court of Customs and Patent Appeals explained:

> [W]e attempt to more closely approximate the reality of the circumstances surrounding the making of an invention by only presuming knowledge by the inventor of prior art in the field of his endeavor and in analogous arts.
>
> The determination that a reference is from a nonanalogous art is therefore two-fold. First, we decide if the reference is within the field of the inventor's endeavor. If it is not, we proceed to determine whether the reference is reasonably pertinent to the particular problem with which the inventor was involved.

inertial device mounted within the reaming head. Any deviation of this mechanism from its planned location would be electrically transmitted to a control unit which would then take the necessary corrective action."

■■■ Defendant contends that the Haag report is a printed publication satisfying all requirements for use as prior art under 35 U.S.C. § 102. In response, plaintiff denies that the Haag report is prior art for a number of reasons, one of which is compelling.[7] Plaintiff is correct that defendant has not satisfied its burden to show that the Haag report was sufficiently accessible to the public to qualify as a printed publication within the scope of Section 102 prior art.[8]

The term "printed publications" appears in both Sections 102(a) and (b). Section 102 provides, in pertinent part:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States[.]

"Public accessibility" is the touchstone in determining whether a document qualifies as a printed publication. *In re Hall*, 781 F.2d 897, 899, 228 USPQ 453, 455 (Fed.Cir. 1986). In *Carella v. Starlight Archery & Pro Line Co.*, 804 F.2d 135, 139, 231 USPQ 644, 646–47 (Fed.Cir.1986), the Court of Appeals for the Federal Circuit, quoting *In re Wyer*, 655 F.2d 221, 227, 210 USPQ 790, 795 (CCPA 1981), described the burden on a party proffering a document as a printed publication, as follows:

[O]ne who wishes to characterize the information, in whatever form it may be, as a "printed publication"

* * * should produce sufficient proof of its dissemination or that it has otherwise been available and accessible to persons concerned with the art to which the document relates and thus most likely to avail themselves of its contents.

In *In re Hall*, the court reiterated this same approach by stating that "[t]he proponent of the publication bar must show that prior to the critical date the reference was sufficiently accessible ... to the public interested in the art...." *In re Hall*, 781 F.2d at 899, 228 USPQ at 455.

To support its contention that the Haag report was "sufficiently accessible ... to the public interested in the art," defendant relies upon a declaration by Hazel T. Horton, Chief of the Document Processing Division, Defense Technical Information Center (DTIC), Defense Logistics Agency.[9] Horton explained generally the procedures employed by DTIC and its predecessor, the Armed Services Technical Information Agency (hereinafter both referred to as DTIC), with respect to cataloging and permitting access to the reports in its files. She stated that DTIC received the Haag

---

7. Defendant contends that by waiting until posttrial briefing, subsequent to the presentation of proposed findings of fact, plaintiff waited too long to object to classification of the Haag report as prior art. But plaintiff gave timely warning of his position when prior to trial he insisted that a proposed stipulation be amended to eliminate a concession that the Haag report was a printed publication and prior art.

8. Plaintiff also alleges, for example, that the Haag report is not prior art because it lacks an enabling disclosure. But, as explained above, the absence of an enabling disclosure is not fatal. Plaintiff also contends that the concept mentioned in the Haag report was derived from statements by plaintiff and did not originate with Haag. But, while the evidence supports such a conclusion, this would not bar the use of the Haag report as prior art. Any invention described in a printed publication more than one year prior to the date of a patent application is prior art under Section 102(b), even if the printed publication was authored by the patent applicant.

9. The declaration was entered into evidence by stipulation of the parties.

report on February 20, 1961, and catalogued it the next day by placing the following reference in DTIC's internal index system.

UNCLASSIFIED

```
AD-221 836 Div. 22, 26 U
(20 Feb 61)
(Unannounced report)

Watervliet Arsenal, N. Y.
SIGNIFICANT ACHIEVEMENTS IN THE REAMING OF GUN
BARRELS.
by H. J. Haag. Apr 57. 22p. incl. illus. (Tech-
nical rept. no. INPRO-129)
 Unclassified report

DESCRIPTORS: *Gun barrels. Cutting tools.
Manufacturing methods. Machining. *Reamers.
Carbide tools. Synthetic rubber.
```

UNCLASSIFIED

As to the accessibility of unclassified DTIC documents, such as the Haag report, Horton described DTIC's customary practice during the pertinent time frame. First, access to DTIC documents was limited to "registered users," which included "government agencies, current government contractors, grantees of government research grants and their universities or research organizations." Second, once the information was placed in DTIC's internal index system, DTIC accepted inquiries from registered users which sought specified documents or documents indexed by particular key words or descriptors. Searches were conducted exclusively by DTIC staff who then forwarded the requested documents free of charge. In addition, DTIC forwarded to major registered users copies of prepared index cards which matched their bibliographic requests. Third, DTIC furnished material to contractors for government purposes only. Horton stated: "At the time frame of the above mentioned documents, it was the usual and customary practice of [DTIC] to forward to [sic] protection restrictions. However, material furnished to contractors was provided for government purposes only based on the contracts registered with [DTIC]." Horton did not indicate which "protection restrictions" applied to the Haag report. Horton indicated that while it was customary to announce and provide a short abstract of newly acquired documents in semimonthly Technical Abstract Bulletins ("TABs"), there is no indication in the records that this was done for the Haag report.

Defendant cites *Boileau v. Diamond*, 209 USPQ 190 (D.D.C.1980), *aff'd in part and rev'd in part*, 659 F.2d 247, 211 USPQ 489 (D.C.Cir.1981), to support its contention that this accessibility of the Haag report is sufficient to satisfy the Section 102 requirements for use as prior art. Like the case at bar, *Boileau* involved a document that had been indexed by DTIC. But while the *Boileau* court determined that the document there involved qualified as a printed publication under Section 102(b), the court did not indicate that accessibility from DTIC files by registered users was itself sufficient to demand that conclusion. The *Boileau* court framed the crucial issue as follows: "[T]he question is whether [the report] can be said to be within reach of the interested public. If those portions of the public technically knowledgeable and interested could have obtained access, then the Report qualifies as prior art." *Id.* at 192. In answering yes to this question, the court did not rely primarily upon the restricted availability of the document from

DTIC but instead relied upon the actual distribution of the document that had occurred within the relevant scientific community. The court stated:

> It is ... undisputable that the document was widely distributed and had acquired an unclassified status considerably prior to July, 1973.... A broad assortment of government agencies, private corporations and universities were in possession of the Report. There is no evidence that discourse was in any way limited among this knowledgeable and experienced subgroup of the public. A request to the Arsenal from any member of the public would have been honored. Where, as here, the wide, unrestricted distribution was among persons skilled in the art, and any obligation of secrecy was effectively disavowed, the Court concludes that public access to the document must be found sufficient to satisfy the statute.

*Id.*

■ The case at bar does not involve similar distribution. There is no evidence in the record of any distribution beyond DTIC; there is no indication that any entity, much less those entities technologically knowledgeable and interested, ever requested or received from DTIC either an actual copy of the Haag report or any information (such as a TAB) indicating that the report existed. Hence, nothing in the record shows that evidence of and access to the Haag report was available other than to registered users through the cumbersome request procedures of DTIC.

The question thus becomes whether access to registered users is itself sufficient, without more, to qualify the Haag report as a printed publication and prior art. In answer, the record simply does not demonstrate that it is. There is no evidence as to the number or specific identity of registered users or the technological knowledge and interests of the individuals who worked for them. There is no evidence as to the particular "protection restrictions" applied to access or use of the Haag report. Indeed, there is no evidence that the two

experts defendant presented to testify on the issue of patent validity could have obtained access to the Haag report from DTIC. In sum, there simply is no proof that the Haag report was accessible to any significant number of "those persons interested and knowledgeable" in this technological area.

The courts have stressed that the question of whether a document constitutes a printed publication turns on a case-by-case evaluation of the facts. *In re Hall*, 781 F.2d at 899, 228 USPQ at 455.[10] Based on the facts in evidence, defendant has not satisfied its burden to qualify the Haag report as a printed publication within the scope of the prior art.

C. Differences Between the Prior Art and the Claimed Invention

1. *The Indicator Patent and the Indicator Device*

With respect to Claim 1 of the controller patent, the parties agree that the indicator patent discloses the boring tool called for in element 1 and the means for advancing the boring tool called for in element 2. In addition, the parties agree that the indicator patent does not address the control of runout and, hence, does not disclose a force generating means for correcting runout called for in element 4. The parties disagree, however, as to whether the indicator patent discloses the means adapted to sense the direction and magnitude of runout called for in element 3. Clearly, in both the controller and indicator patents the respective accelerometers produce the same type of signal which contains the same information concerning the direction and magnitude of runout. But the indicator patent concerns only detecting and not controlling runout. Therefore, there is no concern in the indicator patent with manipulating the accelerometer signal in such a way as to assure that the sinusoidal signal could be used as an error signal to control

---

**10.** Plaintiff, in effect, faults the Horton declaration for indicating the customary procedures employed but not presenting clear and convincing evidence that the Haag report was actually handled pursuant to those procedures. But the Horton declaration, absent rebuttal evidence, supports a conclusion that the Haag report was handled consistent with ordinary and customary procedures.

runout. In addition, the only discussion in the indicator patent that arguably suggests that the accelerometer signal contains information concerning the direction of runout is the vector theory discussion in columns 3 and 4 of the specification and the corresponding figures. As explained above, that portion of the indicator patent was solely plaintiff's contribution and therefore is not prior art.

With respect to Claims 2 and 6 of the controller patent, since the indicator patent does not disclose any force generating means, it obviously does not describe the specific hydraulic force generating means called for in Claim 2 or the electromagnetic means called for in Claim 6. As to Claim 5 of the controller patent, the indicator patent does disclose the use of the hinged pendulum member and rotary variable differential transformer called for in Claim 5.

As to the indicator device, apparently the device is simply an embodiment of the device described in the indicator patent. The device contains no "force restoring means" as called for in Claim 1 (element 4) of the controller patent, and defendant has not established that its accelerometer signal was manipulated by the electrical circuitry in such a way as to be directly useable as an error signal to control runout.

### 2. *The Leaver Patent*

The Leaver patent, entitled "Method and Apparatus for the Automatic Control of Machinery," describes, in general, the recording of movements of a machine tool during performance of a particular job by a skilled operator, and the later use of that recording to perform the same job automatically, *i.e.*, the machine repeats automatically and at optimum speed the recorded movements of the machine parts.

Defendant relies primarily on the Leaver patent's discussion of the use of an information signal and a prerecorded standard signal to keep a machine tool moving along a desired path. In operation, the machine cutting tool is mounted on a cross slide, the movement of which is controlled by a gear box and motor. A synchro (a type of transformer) sends out a signal indicating the actual position of the machine tool. The

synchro signal travels to a phase detector where it is compared with a preprogrammed position signal generated by a demodulator. The phase detector produces a negative signal indicating any difference between the actual and desired position of the cutting tool. That difference signal ultimately directs the cutting tool to move along the cross slide to its desired position. Thus, the motion of the cutting tool is controlled through a feedback system in which two signals are compared and a third signal is created to indicate how far the cutting tool has moved from its desired position. In response to this third signal, a force is generated to move the cutting head back to its desired position.

Hence, the Leaver patent does not specifically address runout during deep boring of a rotating object and does not specifically employ any of the four elements called for in Claim 1 of the controller patent. However, like the controller patent, the Leaver patent employs a negative feedback system in which a cutting tool is moved to a desired position in response to an electrical error signal. But while the controller patent involves only one signal—the accelerometer signal, the Leaver patent produces an error signal by a comparison of two separate signals. In addition, in the Leaver patent, none of the signals is generated by an accelerometer; the signal indicating the cutting head's desired position is preprogrammed; and the signal indicating the cutting head's actual position is produced by an electrical transformer. Hence, while the Leaver patent teaches the use of a negative feedback system, it teaches nothing about using the phase of an accelerometer signal to indicate the radial direction of an error in deep boring operations.

### 3. *The Forrester Patent*

The Forrester patent, entitled "Numerical Control Servo–System," also relates to controlling the operation of a machine tool. The patent describes the purpose of the invention as "to provide an improved control system which is especially desireable for machining mathematically definable surfaces without resorting to the expensive practice of first constructing models or templates having better than the required accuracy of the finished work." The con-

trol system involves storing information relating to the coordinated movement of a machine in coded form and using electrical means for interpreting the coded information and transmitting it to the moving part of the machine.

In attacking the validity of the controller patent, defendant relies primarily upon Figures 10 and 11 of the Forrester patent. These figures show an apparatus for moving a work piece supported by a table to a desired position. The movement is produced by a feedback signal. Figure 10 is illustrative.

**Fig. 10**

Figure 10 depicts one of three servomechanisms used in controlling a three-axis machining device. In Figure 10, a work piece is supported on a slide or table (element 14). The table is moved by a lead screw (element 302) that is geared to a hydraulic transmission at one end (element 306). In operation, two signals are fed into an amplifier (element 322). The first signal, from a synchro receiver (element 154) indicates the present position of the table. The second signal, from a syncro transmitter (element 146), indicates the desired or command position of the table. The difference between the actual and desired position of the table is transmitted as an error signal (along element 320) and is returned to the hydraulic transmission. The error signal then modifies the hydraulic transmission such that the table is moved. The position error is thereby controlled with respect to one of the three axes of the machining device. The error with respect to the other two axes is similarly controlled through the use of command and actual position signals.

Thus, the Forrester patent is similar to the Leaver patent in that it teaches the operation of a machine tool using a feedback system whereby an error signal is used to create a force on the cutting tool to displace the tool to its desired position. The Forrester patent is also different from the controller patent in some of the same ways as the Leaver patent. The Forrester patent does not use accelerometers, uses two signals rather than one to produce an error signal, and does not teach that the phase of an accelerometer contains information as to the direction of any departure from the desired position of the cutting tool.

### 4. *The Bower Text*

Defendant relies upon the Bower text to show that the use of servomechanisms for correction of error was well known prior to

filing the controller patent application. The Bower text defines a servomechanism as follows:

We shall certainly call a device a servomechanism if it satisfies the following description:

The device controls some physical quantity by comparing its actual value C with its desired value R and uses the difference (or error) R–C to drive C into correspondence with R.

There is no restriction on the nature of the physical quantity being controlled. It may be position, velocity, temperature, light intensity, chemical composition, or any other measurable and controllable entity the reader may care to name. As a rule, the power required to vary the controlled quantity C is large compared to the power available in the reference input R, so that a servomechanism usually includes power-amplifying equipment. This, however, is incidental. The basic property implied by the foregoing description is feedback, the comparison of output and input, and the control of the output in accordance with its deviation from the desired value. A servomechanism monitors its own performance and makes corrections when necessary.

Thus, the Bower text simply provides some basic information concerning the operation of servomechanisms such as the servomechanisms employed for displacement of the cutting tool in the Forrester and Leaver patents. The Bower text does not discuss any particular structure and does not specifically discuss the usefulness of these servomechanisms in deep boring operations.

### D. The Level of Ordinary Skill in the Art

■ The parties disagree as to the level of ordinary skill in the art. Plaintiff argues that since the Arsenal is the sole manufacturer of large cannon barrels in the United States, the place to look when assessing the level of ordinary skill in the art is to Arsenal employees. Plaintiff notes that Arsenal employees with pertinent responsibility in cannon manufacture had no college education but significant practice experience with reamers used at the Arsenal for deep boring gun barrels.

But it is incorrect to view the controller patent as narrowly involving the manufacture of large cannons. Rather, the controller patent is directed at the design of a machine tool employing a control system to control runout in deep boring operations. All relevant evidence considered (see *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696, 218 USPQ 865, 868 (Fed. Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984)), defendant is correct that the pertinent level of ordinary skill in the art in early 1961 was an individual with a bachelor of science degree in electrical engineering with four years of machine tool design experience.

### E. Secondary Considerations

So called "secondary considerations" are often "the most probative and cogent evidence" dealing with the issue of nonobviousness. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538, 218 USPQ 871, 879 (Fed.Cir.1983). Herein, the sole alleged commercial success of the controller patent is the alleged infringement of the patent at the Arsenal. The evidence indicates that there was a long-felt need at the Arsenal for an improved system for controlling runout, that the alleged infringing Arsenal device filled that need, and that the Arsenal device was a significant technological step forward and produced important cost savings.

But "[a] nexus is required between the merits of the claimed invention and the evidence offered, if that evidence is to be given substantial weight enroute to conclusion of the obviousness issue." *Id.* at 1539, 218 USPQ at 879. Defendant argues that the Arsenal device does not infringe the controller patent and, therefore, any commercial success of the Arsenal device should not impact the validity of the patent. In addition, defendant argues that even assuming infringement, the commercial success of the Arsenal device relates to improvements initiated at the Arsenal rather than the structure disclosed in the controller patent. But this court concludes below that the Arsenal device does infringe the claims of the controller patent. Moreover, the evidence viewed *in toto* indicates

that the commercial success of the Arsenal device stems in large part from the technological breakthrough described in the controller patent.

### F. Analysis and Conclusion—Claims 1, 2, and 5 are Not Obvious in View of the Prior Art

■ Defendant has failed to overcome the statutory presumption of patent validity because it has not proved that the "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time of the invention was made to one of ordinary skill in the art." 35 U.S.C. § 103.

As explained above, none of the prior art teaches the electronic or mechanical control of runout during deep boring operations. The indicator patent and the indicator device involve deep boring and use of an accelerometer to produce an error signal, but do not teach that this signal is indicative of the direction of runout or that the signal can be used to activate a force generating means which can be used to control the direction and magnitude of runout. The remaining references in varying ways teach or suggest the production and the use of error signals for making corrections during machine tool operations, but none discusses the particular problems faced in controlling runout during deep boring of a rotating object, and none discloses any means to produce an effective error signal during deep boring operations. Specifically, there is no suggestion in the prior art that the signal emitted by an accelerometer attached to a boring head contains information as to the direction of runout and can be used as an error signal to generate a restoring force to control runout.

Though the use of error signals, negative feedback, and servomechanisms was prevalent in the early 1960s, until plaintiff made his discovery, the long-felt need for increased control in deep boring of cannons remained unfulfilled. The technological advance described in the controller patent was not rendered obvious by the prior issuance of the indicator patent. The prior art, when considered together and as a whole, simply does not suggest the benefits that resulted from plaintiff's invention or otherwise render obvious to one of ordinary skill in the art the deep boring device covered in Claims 1, 2, and 5 of the controller patent.

### VI. *Claim 6 is Not Invalid Based on Lack of Utility*

■ Based primarily on the testimony of Russell Tompkins, defendant contends that Claim 6 is invalid because the structure described therein is inoperable and lacks utility. In pertinent part, Claim 6 calls for an electromagnetic "force generating means." Defendant argues that if the electromagnetic force generating means disclosed in the controller patent were used, the forging would become magnetized and the inner portion of the forging would attract the metal chips cut during the boring operation. Defendant argues that these chips would "cause havoc in the boring operation," for example, by cutting the insulation from the electrical wires used to generate the electromagnetic force or by gouging or scarring the inner surface of the forging.

But while Tompkins indicated the possibility of problems arising if such an electromagnetic "force generating means" were employed, his testimony does not support a conclusion that the problems would be so significant as to render the claimed device inoperable. Tompkins testified that it would be "very likely" that the forging would be magnetized and attract chips, and that such attraction "*could* cause a lot of havoc" (emphasis added). He did not testify that the chips *would* cause havoc, nor did he precisely define what he meant by havoc. Tompkins testified that he did not know whether the magnetic attraction would result in the chips jamming the clearance between the boring head and the forging "so as to terminate . . . or severely hamper the boring operation." As to possible scarring of the forging, Tompkins did not quantify the amount of scarring likely, did not state that scarring would render any forging unusable, and did not know

whether the scarring could be eliminated through inclusion of some simple mechanical device. As to possible cutting of the insulation of the wiring, Tompkins merely indicated that one would have to be "very careful" not to scrape the insulation off the coils. He did not testify that the removal of insulation would necessarily occur, or that it could easily be prevented by careful design.

■ A patent is presumed to have utility (*Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707, 714, 223 USPQ 1264, 1269 (Fed.Cir.1984)), and to overcome this presumption, an alleged infringer must prove "total incapacity [of the claimed invention] with facts supported by clear and convincing evidence." *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1269, 229 USPQ 805, 810–11 (Fed.Cir. 1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987). Tompkins' testimony falls far short of establishing a lack of utility under this standard.

## VII. Analysis of Whether the Controller Patent Covers the Arsenal Device

### A. Legal Standards

Pursuant to 28 U.S.C. § 1498, a patent owner is authorized to recover just compensation for unauthorized use or manufacture by the United States of inventions "covered by a patent," *i.e.*, covered by the patent claims. The legal and factual analysis employed to determine unauthorized use or manufacture under Section 1498 is the same as the analysis used to determine "infringement" under 35 U.S.C. § 271(a)—if the alleged infringing device "infringes" a patent claim it is "covered by" the patent. *Lemelson v. United States*, 752 F.2d 1538, 1548, 224 U.S.P.Q. 526, 531 (Fed.Cir.1985). *See also Teledyne*

*McCormick Selph v. United States*, 214 Ct.Cl. 672, 682–85, 558 F.2d 1000, 1005–07, 195 USPQ 261, 265–67 (1977); *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974, 226 USPQ 5, 7–8 (Fed.Cir.1985). In both analyses, initially the scope of the relevant claims is ascertained and then a determination is made as to whether the claims as so interpreted cover the accused device. *Id.*

■ A device can be covered by or infringe (hereinafter infringe) a patent claim in either of two ways. First, the device can literally infringe the claim. Literal infringement results where the claim "reads on" the accused device, *i.e.*, the device contains each and every element and limitation called for in the claim. *Mannesmann Demag Corp. v. Engineered Metal Products Co.*, 793 F.2d 1279, 1282, 230 USPQ 45, 46 (Fed.Cir.1986). Second, infringement can result under the doctrine of equivalents, when the alleged infringing device and the device defined in the patent claim "perform substantially the same function in substantially the same way to obtain the same result." *Graver Tank Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). Herein, plaintiff alleges both literal infringement and infringement under the doctrine of equivalents for Claims 1 and 2, and infringement under the doctrine of equivalents for Claims 5 and 6.

### B. The Alleged Infringing Arsenal Device

■ Plaintiff alleges that the controller patent covers six distinct lathes used at the Arsenal in the manufacture of gun barrels. The six lathes involve three generations of technology.[11] While the structures of the three generations of machines differ somewhat, the parties have selected the third generation machines as representative and have stipulated that the court's decision on

11. The first generation structure was first used in cannon manufacture in 1968. A standard Niles Lathe was adapted with accelerometers to sense runout and a series of hydraulic piston-like elements to move the cutting head back to its desired position. The second generation machine, a modified Century Detroit Lathe, was first used in 1972 in the production of 8 inch and 175mm gun barrels. It also used accelerometers to sense runout and hydraulic pistons to control runout but it differed structurally

from the Niles Lathe in a variety of ways. The third generation structure, a modified Century Detroit Lathe, was first used in 1975 in the production of 155mm gun barrels. This device used accelerometers to detect runout but employed hydrostatic bearings, instead of rigid pistons, to move the cutting head back to its desired position. This same third generation technology was later employed with other Century Detroit Lathes in the manufacture of 105mm and 8 inch gun barrels.

infringement on those machines shall apply with respect to the remaining alleged infringing devices.

The third generation machines employ a lathe attached to a conventional boring bar. At the end of the bar is a boring head. The boring head contains cutters mounted on its horizontal plane and two capacitive displacement accelerometers mounted at the rear of the cutters, also on the horizontal plane. The accelerometers are capable of detecting the horizontal component of the acceleration of the boring head. Each accelerometer employs a "forcer coil" which is supported by a number of flexure arms. When runout occurs, the acceleration that results causes submicroscopic displacement of the forcer coil. This movement results in an increase in the electrical current flowing through the forcer coil so as to hold the coil nearly stationary. The varying amount of current flowing through the forcer coil is proportional to the amount of acceleration. The increase in the flow of electrical current ultimately results in the production of a sinusoidal signal which is indicative of the direction and magnitude of runout.

The boring head also contains eight hydrostatic bearings (pads or pockets)—a front set of four and a rear set of four. For each set, the four individual pads are referred to as front, rear, top, and bottom, where the front and rear pads are mounted on the horizontal axis of the boring head, and the top and bottom pads are mounted on the vertical axis, respectively.

The following diagrams depict a top view and cross-section of a boring tool, which would be inserted into a forging.

### TOP VIEW OF BORING TOOL

(* LOCATION OF BOTTOM PAD FOR FRONT AND REAR SETS NOT SHOWN.)

### A-A CROSS-SECTION OF BORING TOOL

The amount of fluid in the hydrostatic pockets is controlled by a Moog valve (also referred to as a four-port valve) which in turn is partly controlled by the sinusoidal

signal produced by the accelerometers during runout. The Moog valve is connected to a hydraulic pump and has two distinct functions. First, it supplies fluid generally to all eight pads through corresponding ports. When the pads are filled with fluid, they provide support for the cutting head. Second, it transfers fluid between the front and rear pads of the front set through additional ports. This shifting of fluid results in the cutting head moving laterally along the horizontal axis of the bored hole, *i.e.*, when viewed along the longitudinal axis of the gun barrel, the boring head may be shifted toward either the nine o'clock or three o'clock position. For example, the Moog valve could add fluid to the front pad of the front set and simultaneously remove fluid from the rear pad of the front set in order to push the boring head toward the rear pad. Thus, under hydraulic pressure, the front and rear pads of the front set move the cutting head along the horizontal axis of the bored hole, while the rear set provides a rigid support and acts as a fulcrum for moving the cutting head.

The hydrostatic bearings function to correct runout. When runout occurs, the accelerometers emit an electrical signal which ultimately causes the Moog valve to shift fluid between the front and rear pads of the front set. This fluid transfer results in movement of the boring head along the horizontal axis toward the axis of rotation of the forging.

In addition to addressing the problem of runout, the third generation controller addresses the problem of "offset" by using a pair of inductive probes horizontally mounted just behind the cutters on the horizontal plane of the boring head. Like runout, offset involves movement of the cutting head. Offset occurs when the forward end of the boring head, as it travels down the forging, is displaced with respect to the finished bored hole either to the right or left on the horizontal plane. Offset occurs when an inefficient cutter requires more force than the cutter on the opposite side, or when runout is present. In either case, the boring head is not exactly centered in the finished bored hole. Specifically, offset is calculated as the sum of the two gaps between the boring head and the bored hole on the front and rear sides of the boring head.

Runout and offset are distinct phenomenons in that there can be runout with no offset and offset with no runout. Both, however, are addressed by changing pressure in the hydrostatic bearings. Thus, the hydrostatic bearings correct any runout sensed by the accelerometers as well as any offset sensed by the inductive probes.

## C. Claim 1—Literal Infringement

There is no dispute that the Arsenal device contains elements 1 and 2 of Claim 1—a boring tool and a means for advancing the boring tool. The dispute herein involves elements 3 and 4 of Claim 1.

### 1. *Element 3 of Claim 1 is Literally Infringed*

Element 3 calls for:

means adapted to sense the direction and magnitude of the run-out from said axis to the center of a bored hole made by said cutting head, said sensing means being adapted to generate a run-out signal indicative of said magnitude and direction whereby the position of the boring tool relative to said axis may be determined.

■ Defendant does not appear to dispute that the Arsenal accelerometer and related circuitry perform the specific functions called for in element 3, *i.e.*, "sense the direction and magnitude of runout" and "generate a run-out signal indicative of ... magnitude and direction [of runout]."[12] But when, as here, a claim defines a device by calling for a series of "means" for performing specified functions (*e.g.*, uses

12. Defendant argues that "[t]he Arsenal device is never concerned with the location of runout." But to correct runout, the force generating means must know when and in which direction to move the boring head. If the boring head is directly to the left of the axis of rotation of the gun barrel, to correct runout the force generating means would have to force the boring head to the right. Since the Arsenal device controls runout, it necessarily utilizes signals containing information as to the direction of runout.

"means plus function" language), mere performance of those functions is not enough to produce literal infringement. 35 U.S.C. § 112 provides, in pertinent part:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Thus, for literal infringement of a claim that employs "means plus function" language, an accused device must not only perform the identical function called for in the claim, but in addition the accused device must employ either "the corresponding structure, material, or acts described in the specification" or "equivalents thereof."

■ The controller patent does not describe the use of forcer coil capacitive displacement accelerometers. The issue with respect to literal infringement therefore is whether the forcer coil accelerometer is the Section 112 "equivalent" of the structures described in the controller patent. Defendant interprets Section 112 as requiring that the accused device employ a structure that is "structurally equivalent" to those described in the patent specification and contends that that requirement is not met here. Defendant is incorrect for two reasons. First, the accelerometer employed in the Arsenal device does have a physical structure equivalent to one of the accelerometers referenced in the controller patent. Second, and in any event, defendant interprets Section 112 too narrowly when it defines the term "equivalent" to include only equivalents in physical structure.

The Arsenal Accelerometer Has an Equivalent Physical Structure to the Accelerometers Described in the Controller Patent

While the controller patent specifically describes only one type of accelerometer, a seismic pendulum, it incorporates by refer-

ence the disclosure in the indicator patent of two additional types, a capacitive displacement accelerometer and an electrolytic accelerometer.[13] The capacitive displacement accelerometer described in the indicator patent has a physical structure that is so close to the structure of the forcer coil capacitive displacement accelerometer in the Arsenal device that the two accelerometers must be deemed to have "equivalent" physical structures.

The capacitive displacement accelerometer described in the indicator patent consists of an electric field formed by three electrodes separated by a suspended hollow metal sphere. One electrode is directly beneath the sphere and emits a current. The other two sensing electrodes are to the left and right of the sphere, respectively. During runout, the sphere moves back and forth between the right and left electrodes as the boring head rotates about the axis of rotation of the forging. This alternating movement results in a sinusoidal electrical runout signal.

The central structural difference between the Arsenal accelerometer and the capacitative displacement accelerometer described in the indicator patent is that the indicator patent accelerometer suspends a sphere between the electrodes while the Arsenal device employs a forcer coil. In both cases, a suspended mass is placed in an electric field formed by a number of electrodes, and acceleration forces caused by runout move the suspended mass closer to and farther from a given supporting electrode. Since these two structures are sufficiently close to be deemed equivalents in physical structure, the Arsenal device would literally infringe element 3 of Claim 1 under defendant's proposed interpretation of Section 112.

Section 112 Does Not Require Equivalent Physical Structures

In any event, however, the term "equivalent" in Section 112 should not be interpreted as being limited to structures that are "equivalent" to the physical structure of

---

**13.** Defendant concedes that these two additional accelerometers should be deemed to be described in the controller patent for purposes of determining Section 112 equivalents.

the "means" disclosed in a patent. The literal wording of Section 112 contains no such requirement. The statute merely refers to structures "described in the specification and equivalents thereof." It does not state that the only possible "equivalents" to the structures described in the specification are devices with equivalent physical structures, *i.e.*, it does not provide structures "described in the specification and *structural* equivalents thereof."

The concept of equivalence has meaning in patent law outside of Section 112 and the concept has not been limited to equivalent physical structures. As noted above, a device that does not literally infringe a patent claim may nevertheless be found to infringe the claim under a patent law doctrine called the doctrine of equivalence. The Supreme Court articulated the standards for applying the doctrine of equivalence in *Graver Tank*, 339 U.S. 605, 70 S.Ct. 854. The Court explained that infringement exists if the alleged infringing device and the device defined in the patent claim "perform[ ] substantially the same function in substantially the same way to obtain the same result." *Id.* at 608, 70 S.Ct. at 856. In addition, the Court noted that "[a]n important factor [in the determination of equivalence] is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." *Id.* at 609, 70 S.Ct. at 857. Thus, under the *Graver Tank* standards, a finding could be made that two devices are Section 112 "equivalents" and, hence, that infringement exists even when the two devices are different "in name, form or shape," *id.* at 608, 70 S.Ct. at 856, *i.e.*, even if there was no equivalence in the physical structures.

■ It is appreciated that applying the doctrine of equivalence is distinct from determining literal infringement of a claim using means plus function language under 35 U.S.C. § 112. But in using the term "equivalents" in Section 112, Congress intended to reference the *Graver Tank* concepts of equivalence. As explained in *Pa-*

*lumbo*, 762 F.2d at 975 n. 4, 226 USPQ at 8–9 n. 4:

Although, as we pointed out in *D.M.I., Inc. v. Deere & Co.*, [755 F.2d 1570, 225 USPQ 236 (Fed.Cir.1985) ], there is a difference between a doctrine-of-equivalents analysis and a literal infringement analysis involving "equivalents" under § 112, *Graver Tank* concepts of equivalents are relevant in any "equivalents" determination. The fact that *Graver Tank* preceded the 1952 Patent Act by two years and the last paragraph of § 112 was new, *see* Reviser's Note, 35 U.S.C. § 112, H.R. Rep. No. 1923, 82d Cong., 2d Sess. 19 (1952), suggests that the Underlying principles of equivalents in *Graver Tank* could be used in a § 112 literal infringement analysis. *Accord Hale Fire Pump Co. v. Tokai*, 614 F.2d 1278, 205 USPQ 123 (CCPA 1980) (applying the *Graver Tank* concepts of equivalents in construing a "means" clause); and *Lockheed Aircraft Corp. v. United States*, 553 F.2d 69, 193 USPQ 449 (Ct.Cl.1977) (*Graver Tank* interchangeability test used in interpreting a "means plus function" claim for literal infringement purposes).

Limiting Section 112 "equivalents" to objects that are structurally equivalent to those objects described in a patent specification would undermine Congress' intent in 1952 in adding the third paragraph of Section 112. By specifically authorizing the use of "means plus function" terminology, Congress apparently recognized that such terminology can be a highly efficient way to draft a patent claim, *i.e.*, to define the metes and bounds of the patentee's invention. However, limiting literal infringement of "means plus function" claims to objects that have physical structures equivalent to those objects specifically described in the patent specification could seriously undermine the usefulness of such claims. Under such an interpretation, literal infringement of a claim may be avoided simply by replacing the structures specifically described in the patent specification with known functional equivalents that operate in substantially the same way but have fundamentally different structures. To

avoid such a result, a patent owner would reasonably have to include in the patent specification an exhaustive list of structures that possibly could perform each function described in the claim. For example, if a claim calls for a means for detecting acceleration, to be assured of broad "literal" coverage a patentee would have to list virtually every known accelerometer structure that could function in the patented device.

All structures that perform a particular function described in a claim fall within the *literal* terms of that claim element, expressed simply as a "means" for performing that function. Congress sought to narrow the scope of literal infringement of such a claim somewhat by providing that the claim encompass only the structure described in the specification and "equivalents" thereof. But defendant has not pointed to anything in the language of Section 112, the pertinent legislative history, or any patent law policy that requires resort to an artificially narrow interpretation of the term "equivalent" which would exclude from literal infringement structures that at the time of the patent's issuance were known to perform the same function, operate in substantially the same way, and achieve the same result as the structures described in the patent's specification. Equivalence of physical structure may be an appropriate part of the analysis but it is not a *sine qua non* for a finding of Section 112 "equivalents." [14]

Applying the *Graver Tank* concepts, the Arsenal's capacitive displacement accelerometer and related circuitry would be "equivalent" to each of the three accelerometers disclosed in the controller patent. Based on the totality of the evidence submitted at trial, the court concludes that

persons reasonably skilled in the art knew at the time the patent was issued that, after appropriate and obvious modification, the Arsenal accelerometer and related circuitry would be interchangeable with any of the three accelerometers referenced in the controller patent. Moreover, the Arsenal device qualifies as a Section 112 equivalent under the tripartite function-way-result test of *Graver Tank*. Whether viewed in isolation or viewed as a part of a runout controller, the Arsenal's capacitive displacement accelerometer performs the same function in substantially the same way and accomplishes the same result as the accelerometers referenced in the controller patent. They all function to detect acceleration and thereby detect runout, and the result of their use is a signal indicative of the direction and magnitude of runout. Clearly, there are some differences in the way the accelerometers operate, but, when all facts are considered, they operate in *substantially* the same way. Each device converts movement of a mass into a sinusoidal electrical signal which contains information pertaining to both the direction and magnitude of runout. Thus, the Arsenal device literally infringes element 3 of Claim 1.

### 2. *Element 4 of Claim 1 is Literally Infringed*

Element 4 calls for:

force generating means adapted to provide a force acting on the cutting head to cause radial displacement of said cutting head responsive to said run-out signal whereby said run-out may be controlled in direction and magnitude.

Defendant contends that the Arsenal device does not literally infringe element 4 on two grounds. First, defendant contends that the hydrostatic bearings in the Ar-

---

14. In *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 4 USPQ2d 1737 (Fed.Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988), the Court of Appeals for the Federal Circuit used the term "equivalent structure" in defining the requirements of 35 U.S.C. § 112. The court stated: "To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find *equivalent structure as well as identity of*

*claimed function for that structure. Palumbo v. Don–Joy*, 762 F.2d 969, 975, 226 USPQ 5, 8 (Fed.Cir.1985)." *Pennwalt*, 833 F.2d at 934, 4 USPQ2d at 1739 (emphasis added.) But the court cited *Palumbo* as support for this position and, as cited above, *Palumbo* interpreted Section 112 as involving *Graver Tank* concepts of equivalence. Hence, it does not appear that the *Pennwalt* court intended to adopt the position that equivalence of physical structure is a *sine qua non* for literal infringement under Section 112.

senal device do not perform the identical function called for in element 4 in that they do not "cause radial displacement of said cutting head responsive to said run-out signal." Second, defendant contends that, in any event, the hydrostatic bearings in the Arsenal device are not "equivalent" to the pertinent structures specifically described in the controller patent and, therefore, pursuant to the last paragraph of Section 112, the Arsenal device does not literally infringe element 4.

The Hydrostatic Bearings Perform the Identical Function Called For in Element 4

Since the hydrostatic bearings in the Arsenal device are located on the horizontal plane of the boring head behind the cutters, the bearings always exert pressure on the cutters to move the boring head to the left or right. The following diagram shows the motion of an offset boring head within a rotating forging. The boring head commences at point 1 (with runout to the right of the center of rotation) and, as the forging rotates, the boring head moves about the center of rotation of the forging from position 1 through position 8. The arrows indicate the direction in which the hydrostatic bearings push the boring head to correct runout during one complete rotation of the forging.

AXIS OF ROTATION OF FORGING

Defendant contends that the claim term "radial" means the passage of an entity, such as a force or vector, through a center and, hence, that radial displacement refers to the direction of movement depicted as arrows below for the eight runout positions.

Defendant argues that because the hydrostatic bearings in the Arsenal device always apply a horizontal force on the boring head, they do not "cause radial displacement of the cutting head" and therefore do not perform the function set forth in element 4. But this argument, which was not directly supported by defendant's own expert,[15] is unconvincing for a number of reasons.

First, as is apparent from a review of the two above diagrams, it is not disputed that at positions 1 and 5 the force applied by the hydrostatic bearings is undeniably radial in nature, i.e., it passes through the center of rotation of the forging. Each of these positions occurs during every revolution of the forging. Therefore, at least at these two points, the Arsenal device performs the function called for in element 4.

15. Edward E. Kirkham testified that he did not have an opinion as to whether the Arsenal device contains a force generating means adapted to provide a force acting on the cutting head to cause radial displacement of the cutting head in response to a runout signal.

Next, with respect to positions 2, 4, 6, and 8, though the restoring force in the Arsenal device is horizontal in direction, pursuant to basic principles of physics, that horizontal force can be broken down into two distinct components, one of which is radial in nature. The following diagram shows horizontal forces broken into such components for positions 2 and 6.

COMPONENTS OF
HORIZONTAL FORCE

HORIZONTAL FORCE
EXERTED BY BEARINGS

Thus, at each position, except where the boring head is directly above (position 7) or directly below (position 3) the axis of rotation, the boring head is subjected to a component of radial force, the effect of which is to displace the boring head toward the center of rotation of the forging.

Finally, and in any event, element 4 does not require that the restoring force actually be radial in nature. Element 4 requires only that the force *cause* the radial displacement of the boring head. In the Arsenal device, the restoring force causes the radial displacement of the boring head in that it functions to displace the boring head from its runout position back to its desired position, *i.e.*, the ultimate movement of the boring head is in a radial direction toward the center of rotation of the forging. For these reasons above, the Arsenal device performs the identical function called for in element 4.

**The Hydrostatic Bearings in the Arsenal Device are the Section 112 Equivalents of the Structures Disclosed in the Controller Patent**

Defendant contends that the Arsenal device does not literally infringe element 4 because the sole structure described in the controller patent that functions as a "force generating means" is an electromagnetic yoke, and the hydrostatic bearings in the Arsenal device are not Section 112 "equivalents" of that yoke. But this argument misreads the controller patent. While there is some ambiguity, it appears that in addition to disclosing use of an electromagnetic yoke, the controller patent discloses the use of a hydraulic piston as a force restoring means for controlling runout. Both the disclosed piston (*see, e.g.,* Figure 11) and the Arsenal's hydrostatic bearings are "hydraulic" in operation in that they move the boring head by utilizing fluid under pressure. The structures of these two hydraulic mechanisms are sufficiently close so as to be "structurally equivalent." Moreover, they perform substantially the same function in substantially the same way (both are hydraulic) to achieve the same result and, therefore, are properly considered "equivalents" under 35 U.S.C. § 112.

In any event, even assuming that the controller patent were not interpreted as describing a hydraulic piston as a force generating means, literal infringement would still exist because the record evidence supports a conclusion that the hydrostatic bearings in the Arsenal device are Section 112 equivalents to the electromagnetic yoke in the controller patent.

 The evidence indicates that persons reasonably skilled in the art at the time the patent was issued would have known the Arsenal's hydrostatic bearings, with limited and *obvious* modifications, would be interchangeable with the electromagnetic yoke

described in the controller patent.[16] At that time, electromagnetic and hydraulic systems generally were recognized as functional substitutes in the control of machine tools. In his original notebook disclosure of his controller device, plaintiff described the "force generating means" as "hydraulic, electromagnetic, or pneumatic." Similarly, when plaintiff disclosed his concept to defendant, he indicated that a "hydraulic" system could be substituted for a proposed electromagnetic system. Interchangeability is further evidenced by Claims 2, 3, and 6 of the controller patent which call for hydraulic, pneumatic, and electromagnetic force restoring means, respectively. *See, e.g., Palumbo,* 762 F.2d at 974–75, 226 USPQ at 8 (other claims in the patent may be considered in construing the scope of a "means plus function" claim).

The Arsenal device passes the tripartite function-way-result test of *Graver Tank.* As explained above, the Arsenal hydrostatic bearings perform the same function as the controller patent's electromagnetic yoke because they both cause radial displacement of the cutting head in response to a sinusoidal runout signal. In addition, they both produce the same result—the movement of the boring head from a runout position to the center of rotation of the forging. Defendant argues that the two systems function in a fundamentally different way, but that argument rests to a significant extent on its conclusion, rejected above, that the hydrostatic bearings do not force the boring head in a radial direction.

The operation of the hydrostatic bearings is described above. The electromagnetic yoke, as described in the patent, operates like the hydrostatic bearings by receiving a sinusoidal signal containing information concerning the magnitude and direction of runout, and then responding to that signal by forcing the boring head toward the center of rotation of the gun barrel. The electromagnets are positioned in quadrature and are sequentially energized. This results in a rotating radial restoring force throughout the 360° of rotation.

Defendant contends that because the hydrostatic bearings produce only a horizontal restoring force, they operate in a fundamentally different way than the electromagnetic yoke. But contrary to defendant's allegations, as explained above, the force exerted by the hydrostatic bearings on the boring head can be characterized as being radial in nature. With the sole exception of when the boring head is precisely above and precisely below the center of rotation, there is a radial component to the restoring force produced by the hydrostatic bearings. The absence of exertion of a radial force at these two positions is a minimal distinction and does not warrant a conclusion that the two devices operate in significantly different ways. All facts considered, while the hydrostatic bearings and the electromagnetic yoke do not operate in an identical way, they can be said to operate in "substantially the same way."

In summary, plaintiff has established that the accused Arsenal device contains each of the four elements called for in Claim 1 and, hence, that Claim 1 covers the Arsenal device and is literally infringed.[17]

16. At trial, plaintiff sought to exclude the testimony of defendant's replacement expert, Edward E. Kirkham, on the issue of whether the Arsenal's hydrostatic bearings are equivalent to the electromagnetic yoke described in the controller patent. Plaintiff argued, *inter alia,* that defendant's original expert witness never addressed this issue and, therefore, the court should not permit the replacement expert to testify on that issue. A replacement expert was required because defendant's original expert became emotionally distressed during his testimony and was physically unable to complete cross-examination. But defendant intended to question its original expert on this issue but cut short his direct testimony because he was be-

having erratically. All factors considered, it is appropriate to permit defendant's replacement expert to testify on this issue. Plaintiff was not prejudiced and had an opportunity to rebut the replacement expert's testimony.

17. Defendant argues that even if the Arsenal device literally infringes Claim 1, such infringement occurred by "a coincidence of happenstance rather than [by] design" and, therefore, no infringement exists under the reverse doctrine of equivalents. *See, SRI Int'l v. Matsushita Elec. Corp.* 775 F.2d 1107, 1123, 227 USPQ 577, 587 (Fed.Cir.1985). But the record evidence does not suggest that the Arsenal device is "so far changed in principle from [the Claim 1 de-

### D. Claim 1—Infringement Under the Doctrine of Equivalents

Plaintiff presents the alternative argument that if Claim 1 is not deemed literally infringed it should be held infringed under the doctrine of equivalents. "When literal infringement under section 112 paragraph 6 is not present the doctrine of equivalents may nevertheless apply...." *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 805 F.2d 1558, 1571, 231 USPQ 833, 841 (Fed.Cir.1986). The range of equivalents allowed to a particular patentee "depends upon and varies with the degree of invention," *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908), with a pioneer patent entitled to a broad range of equivalents, *Hildreth v. Mastoras*, 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112 (1921).

Herein, the controller patent is properly classified as a "pioneer patent." Plaintiff apparently is the first person to design a device that corrects runout during deep boring operations. Though the problem of runout has existed for decades, there was no prior art cited that sought to address runout through a self-correcting boring head.

As this court concluded above, the accused Arsenal device performs each of the functions called for in elements 1 through 4 of Claim 1 and does so by using devices that are identical or equivalent to those particular devices described in the specification of the controller patent. For the reasons generally set forth in those above discussions, when the device defined in Claim 1 is considered as a whole and compared with the accused Arsenal device, it is apparent that both devices perform the same function, work in substantially the same way, and achieve the same overall result. *Pennwalt*, 833 F.2d at 934, 4 USPQ2d at 1739; *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856. Therefore, even if this court were incorrect and plaintiff had not established literal infringement of Claim 1,

plaintiff has established infringement under the doctrine of equivalents.

### E. The Arsenal Device Infringes Claims 2, 5, and 6

Claim 2

Claim 2, dependent upon Claim 1, adds the further limitation to element 4 of Claim 1: "wherein said force generating means are hydraulic means." Defendant's own expert witness conceded that hydraulic means, "broadly speaking," encompass the Arsenal device's hydrostatic bearings. Therefore, the additional limitation in Claim 2 would not result in a different infringement conclusion for Claim 2 than Claim 1.

Claim 5

Claim 5, also dependent upon Claim 1, adds the further limitation to element 3 of Claim 1:

A device as in Claim 1 wherein said means to generate a run-out signal comprise movable means mounted on said boring tool for sensing movement of the boring tool, whereby upon said boring tool being subjected to run-out, the center of said boring tool orbits about the said center line and imparts oscillatory motion to said movable means, and electrical means responsive to the movement of said movable means for indicating the existence and degree of run-out, wherein said movable means includes a pendulum member hingedly mounted on the center line of said boring tool and vibrating in response to the orbital motion of said boring tool, and wherein said electrical means include a rotary variable differential transformer, wherein said transformer is sinusoidally modulated by said pendulum swings.

Plaintiff concedes that the accused Arsenal device does not literally infringe Claim 5 because the capacitive displacement accelerometer and related circuitry in the Arsenal device differ structurally from the "moveable means" and related "electrical means" specifically called for in Claim 5.

---

vice] that it performs the same or similar function in a substantially different way." *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856. To the

contrary, as explained above, the Arsenal device operates in substantially the same way as the device disclosed in the controller patent.

The issue, therefore, is whether infringement exists under the doctrine of equivalents.

In arguing against application of the doctrine of equivalents, defendant stresses the structural differences between the capacitive displacement accelerometer and related circuitry employed in the Arsenal device and the "moveable means" and "electrical means" called for in Claim 5. Defendant contends that the Arsenal accelerometer is not hingedly mounted, does not experience occilatory swings, and, in addition, does not employ a rotary variable differential transformer to transform motion into an electrical signal. But identity of structure and operation is not required for infringement under the doctrine of equivalents. For each element set forth in Claim 5, there is a corresponding "substantially equivalent" structure in the Arsenal device. *See Pennwalt*, 833 F.2d at 935, 4 USPQ2d at 1739–40. The forcer coil in the Arsenal device corresponds to the pendulum member in Claim 5. Both vibrate (the forcer coil submicroscopically) in response to the orbital motion of the boring tool. As to the electrical circuitry, while the Arsenal device does not employ a rotary differential transformer, it utilizes capacitive circuitry to accomplish the function of such a transformer, *i.e.*, transforming the movement of the accelerometer into a sinusoidal signal.

All facts considered, plaintiff has established infringement under the doctrine of equivalents. The Arsenal device performs the same function and achieves the same overall result as the claimed device. While the two devices do not operate identically, they operate in substantially the same way. In both devices, an accelerometer is attached to a boring head, the accelerometer contains a part that moves when runout occurs, the movement ultimately results in a sinusoidal signal indicative of the magnitude and direction of runout, and the signal is then translated into a force that moves the cutting head back to the center of rotation of the forging. In addition, persons reasonably skilled in the art knew at the time the patent was issued that after appropriate and obvious modification the Arsenal accelerometer and related circuitry would be interchangeable with the controller patent's seismic pendulum.[18]

### Claim 6

Claims 1 and 6 are independent. On the infringement issue, the pertinent difference between Claim 6 and Claim 1 is that Claim 6 specifically requires that the force generating means be electromagnetic in nature. Since the hydrostatic bearings used in the Arsenal device are not electromagnetic, the Arsenal device does not contain each of the elements called for in Claim 6 and, hence, does not literally infringe Claim 6. The issue again, therefore, is whether infringement exists under the doctrine of equivalents.

In the discussion of infringement of Claim 1 above, this court concluded that the hydrostatic bearings in the Arsenal device are the Section 112 "equivalents" of the electromagnetic yoke described in the controller patent. Based on that discussion and conclusion, when the device defined in Claim 6 is considered as a whole and compared with the Arsenal device, it is apparent that both devices perform the same function, work in substantially the same way, and achieve the same overall result. *Id.* at 934, 4 USPQ2d at 1739; *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856. Therefore, the court concludes that plaintiff has established infringement of Claim 6 under the doctrine of equivalents.

## VIII. *Laches*

There is no dispute that this action was filed within the time period provided in the controlling statute of limitations. Defendant contends, however, that while plaintiff satisfied the statutory filing requirements, plaintiff's delay in filing this action warrants dismissal under the judicially created doctrine of laches.

---

18. As explained above, the indicator patent specifically describes a capacitive displacement accelerometer (structurally equivalent to the Arsenal's) as being interchangeable with a seismic pendulum.

## A. Legal Standards for Laches

In patent cases, a successful laches defense bars recovery of damages for any infringement that occurred prior to the filing of suit. *Jamesbury Corp. v. Litton Industrial Products, Inc.*, 839 F.2d 1544, 1551, 5 USPQ2d 1779, 1785, *cert. denied*, 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 57 (Fed.Cir.1988). Since the doctrine of laches is equitable in nature, acceptance of a laches defense is within the trial court's reasonable discretion and depends upon consideration of all facts in a particular case. At a minimum, an alleged infringer must establish an unreasonable and inexcusable delay in asserting a laches defense, and a material prejudice to it resulting from that delay. *Id.* at 1551–52, 5 USPQ2d at 1785. The period of delay is measured from the time the patent owner knew, or in the exercise of reasonable diligence should have known, of the alleged infringing activity. *Id.* at 1552, 5 USPQ2d at 1785. Where the patent owner's delay in filing suit exceeds six years, a rebuttable presumption arises that the delay was unreasonable and that the alleged infringer was materially prejudiced.

## B. Plaintiff's Efforts to Determine Whether the Arsenal Device Infringed the Controller Patent

Plaintiff suspected the device developed by Bergen infringed his controller patent and made inquiries to the Arsenal about such infringement in late 1966. In a November 22, 1966, letter, counsel for the Arsenal responded. Based on the advise of Leon Newman, patent advisor to the Arsenal, Arsenal counsel advised plaintiff that the Bergen device did not infringe the controller patent because the device accomplished its sensing operation "without actually determining the direction and magnitude of the runout."

Plaintiff did not, however, accept this conclusion and, in 1967, filed an administrative claim alleging infringement. Plaintiff's claim was denied in a March 25, 1968, letter in which the Arsenal asserted that "the only procurement of significance to the claim is [the Bergen procurement]" and that the Bergen device, in effect, did not infringe the patent for two distinct reasons. First, the Bergen device "was purchased for research and development purposes, and therefore its use is experimental use not constituting infringement." Second, the Bergen device was structurally different than the device described in the controller patent. The letter contained an attachment under the heading "Comparison of Claims with Procurement." The comparison, prepared by Newman, stated that unlike Claim 1 of the controller patent, the accused Arsenal device, *inter alia*, had "[n]o means adapted for sensing of direction or magnitude of run-out. No means adapted to generate a run-out signal indicative of the same." The letter focused exclusively on the Bergen device and made no mention that the Arsenal had assembled its own control device for deep boring.

Thereafter, in a May 1968 meeting with a Bergen employee, plaintiff secured additional information suggesting that the Bergen device was covered by plaintiff's patent. The employee indicated, in effect, that after two years of struggling unsuccessfully at the Arsenal to design around the controller patent, Bergen had proceeded to design according to the patent.

In a March 16, 1970, letter, plaintiff informed the Arsenal of the Bergen employee's statement and offered the Arsenal a license under his patent if it purchased a runout controller from FCA. When plaintiff made this offer he did not know that the Arsenal's use of guided boring had extended beyond the use of the Bergen device for experimental purposes. In a response dated April 8, 1970, Newman refused plaintiff's offer and stated that "there has not been any change in the facts on which the [Arsenal] based its 25 March 1968 denial of [plaintiff's] administrative claim for patent infringement." The letter did not mention that the Arsenal had developed a bore guidance device in house and as of December 1968 used the device to control the deep boring of an object rotating about an axis.

On May 26, 1977, an article appeared in the *Times Union* newspaper describing an

award given to Wondisford for the development of a guided boring system for gun barrel manufacture. With the knowledge that the Arsenal had successfully used a guided boring device in the production of gun barrels, plaintiff sought to determine whether the device infringed his controller patent. In an effort to save the expense of a legal action, in an August 26, 1977, letter plaintiff requested Congressman Stratton to institute a congressional investigation. On April 6, 1978, Congressman Stratton suggested that plaintiff present his claim to the United States Court of Claims. Plaintiff and his counsel requested an opportunity to inspect the equipment at the Arsenal. The Arsenal permitted an inspection on March 13, 1979. Thereafter, on June 12, 1979, plaintiff filed a second administrative claim alleging infringement. The claim was denied on October 1, 1980, and plaintiff filed the instant action five days later, on October 6.

### C. Defendant has Not Established a Laches Defense

■ Defendant contends that the evidence presented at trial supports a conclusion that plaintiff knew, or reasonably should have known, about the Arsenal's alleged infringing activity by at least 1971. Hence, defendant argues, the delay in filing suit was in excess of six years and the presumption developed in the case law of unreasonable delay and prejudice should apply.

Clearly, plaintiff suspected that the Bergen device infringed his patent as early as 1966, and the 1968 statements by a Bergen employee served to confirm that suspicion. But Arsenal representatives informed plaintiff that the Bergen device had been used exclusively for experimental purposes, and plaintiff apparently had no reason to doubt that representation. Since, as defendant implied, experimental use may not constitute infringement, *Chesterfield v. United States*, 159 F.Supp. 371, 141 Ct.Cl. 838, 845–46, 116 USPQ 445, 448 (1958), plaintiff's decision not to bring suit in 1971 based on his knowledge of the Berger device appears clearly reasonable. In fact, as summarized above, the Arsenal never used the Bergen device commercially but instead developed its own commercial guided boring device. The crucial question in assessing whether laches should apply, therefore, is what did plaintiff know about the commercial device the Arsenal had developed and when did he know it. The ultimate answer is that prior to 1978, plaintiff did not know enough about the structure of the Arsenal device for the court to render his failure to institute suit either unreasonable or unexcusable.

Despite plaintiff's frequently expressed concerns about the Arsenal possibly infringing his patent, Arsenal personnel did not inform plaintiff directly that gun barrels were being produced at the Arsenal using guided boring machines. Indeed, in his 1970 letter to plaintiff, Newman represented that there had not been any change in the facts upon which defendant based its denial of plaintiff's 1968 administrative claim even though, in fact, the Arsenal had developed a guided boring device which already had been used to control the deep boring of an object rotating about an axis.

The evidence that most strongly supports a conclusion that plaintiff was aware of the Arsenal's guided boring device is plaintiff's 1977 letter to Congressman Stratton. Therein, in reviewing the pertinent history, plaintiff refers to a May 1971 letter he had received from Folsom. Plaintiff stated:

> On May 28th, 1971, a letter from William Folsom to de Graffenried reported on a conversation which Folsom had with [an Arsenal employee]. The gist was:
>
> 1. the Arsenal now has 4 or 5 Runout Systems
>
> 2. they do not expect to buy any more
>
> 3. they expect to release the technical information soon on same
>
> 4. to get the technical information, write to Commanding Officer, Watervliet Arsenal
>
> 5. Bethlehem Steel may soon buy a system.

But, while this reference indicates that in 1971 plaintiff knew there were runout systems being used at the Arsenal, there is no evidence in the record indicating that plain-

tiff had direct knowledge at that time, or any time prior to 1978, of the physical structure of the controllers used at the Arsenal. Plaintiff could not conclude that his patent was being infringed simply from the Arsenal's use of a runout controller. Plaintiff originated and patented one possible concept for controlling runout, and plaintiff was not in a position to conclude that any runout controller developed by the Arsenal would necessarily or even likely be covered by his patent.

Indeed, plaintiff took all of the steps reasonably possible, short of instituting suit, to determine whether the Arsenal was being forthright in its allegations of noninfringement. The structure of the Arsenal device could not be determined by examining a finished gun barrel. Therefore, to determine whether the controllers used at the Arsenal were covered by his patent, plaintiff had to inspect the actual Arsenal device or blue prints depicting its structure. But the Arsenal is a restricted area and plaintiff could not make such an inspection without the Arsenal's authorization. Plaintiff had arranged for an inspection on February 2, 1967, but when plaintiff and his counsel arrived at the Arsenal, the previously granted authorization was revoked. Another request had been denied in 1968.

When the facts presented at trial are viewed *in toto*, the equities clearly favor reaching the merits of plaintiff's cause of action. While plaintiff made his allegations of infringement directly and clearly,

defendant was much less forthright in its responses. Even assuming there were no intentional misrepresentations by Arsenal employees, their actions appear carefully crafted as to discourage plaintiff from pursuing the matter further and thereby to avoid any infringement litigation against the Arsenal. The Arsenal letters focused exclusively on the Bergen device and did not disclose the existence of the far more significant control boring system being developed and used internally at the Arsenal. Moreover, the Arsenal did not disclose the structure of the Bergen device, including its use of accelerometers, but instead merely described the device in a conclusory fashion. When plaintiff sought a viewing of the device to determine its structure, defendant refused.[19]

In sum, the record evidence indicates that plaintiff did not know the structure of the device being used commercially at the Arsenal until 1978 when the Arsenal first permitted plaintiff to view its guided boring device. Prior to 1978, plaintiff exercised reasonable diligence in his effort to determine whether his patent was being infringed at the Arsenal but, based in part on defendant's actions, did not uncover significant information suggesting infringement.[20] This fact pattern does not remotely favor this court exercising its equity power in a manner that would free defendant from liability it otherwise would have for the unauthorized use of plaintiff's pat-

---

**19.** Defendant contends that it has been prejudiced by the delay in instituting suit in that the memories of witnesses have faded, documents were lost, an important government witness died, and the Arsenal procured additional bore guidance devices. In response, it cannot be disputed that a trial conducted years earlier would have been more efficient for resolving disputed issues of fact. But it is not apparent that the delay necessarily harmed defendant any more than it harmed plaintiff. Moreover, for the reasons described above, the delay is attributable more to defendant's conduct than to plaintiff's. Had defendant apprised plaintiff of the structure of the Arsenal device in 1971, plaintiff could have brought suit then and the instant dispute would have been resolved long ago.

**20.** Plaintiff testified that one of the reasons he did not institute suit earlier was that he had insufficient funds. In evaluating a laches defense, courts have generally held that a lack of funds does not excuse an otherwise unreasonable delay in filing suit.
See, e.g., *Hayward v. National Bank*, 96 U.S. 611, 618, 24 L.Ed. 855 (1878); *Casey v. United States*, 226 Ct.Cl. 584, 586 (1981); *Naxon Telesign Corp. v. Bunker Ramo Corp.*, 686 F.2d 1258, 1261, 216 USPQ 658, 660 (7th Cir.1982). But plaintiff's lack of funds was not the sole reason plaintiff did not institute suit. More importantly, the issue is not whether plaintiff could have filed a patent suit against defendant but rather was plaintiff equitably obliged to file suit based on the information he had. For the reasons set forth above, the answer to the latter question is no.

ent property. The defense of laches is therefore denied.

### Conclusion

For the reasons set forth above, plaintiff has demonstrated that Claims 1, 2, 5, and 6 of the controller patent cover the Arsenal device, and defendant has failed to demonstrate that the claims are invalid or that plaintiff's cause of action is barred by the doctrine of laches. Plaintiff, therefore, has established defendant's liability and the sole remaining issue is damages. On or before June 11, 1990, the parties shall file a joint status report proposing further scheduling on the damage issue.

IT IS SO ORDERED.